**IN THE UNITED STATES DISTRICT COURT**
DISTRICT OF COLUMBIA

---

| | |
|---|---|
| MARTHA-LUCIA SIERRA | |
| Plaintiff, | |
| v. | Civil Case No. _____ |
| DAVID S. MAO, in his Official Capacity as Acting Librarian, United States Library of Congress | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendant. | |

---

NOW COMES Plaintiff, Martha-Lucia Sierra, (hereinafter "Plaintiff" or "Ms. Sierra") by and through her attorney, Christopher M. Brown and the law firm of ACKERMAN BROWN PLLC, and in support of her Complaint and Demand for Jury Trial against the above-captioned Defendant, states and alleges as follows:

## NATURE OF THE ACTION

1.      This action is necessary to vindicate Ms. Sierra's rights as a longtime and dedicated employee of the Library of Congress (hereinafter "Defendant" or "Library") whose supervisor's demonstrable bias and hostility toward her has resulted in a hostile work environment and the repeated refusal to promote Ms. Sierra despite the fact that she has merited promotion.  Ms. Sierra has repeatedly suffered loss of professional and economic opportunity at the hands of supervisors who harassed her and treated her disparately because of her race (Hispanic), sex (female), and national origin (Colombia). During the pendency of her administrative complaint of discrimination and harassment with the Library, the Library retaliated against Ms. Sierra when it again refused to

promote her in 2016 because of her active opposition to the Library's discriminatory treatment of her.

## JURISDICTION AND VENUE

2.      This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

3.      This action is filed pursuant to 42 U.S.C. § 2000e-16(c) because it has been more than 180 days since the Plaintiff filed her initial charge of discrimination with the Library, and there has been no final disposition of Plaintiff's charge by the Library.

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States, and particularly under an Act of Congress providing for the protection of civil rights.

5.      Venue is proper in this Court because each of the actions giving rise to Plaintiff's causes of action occurred in the District of Columbia and Defendant is located within the District of Columbia.

6.      Pursuant to 42 U.S.C. § 2000e-16(c), Plaintiff brings suit against David S. Mao as the head of the agency because he serves as the acting Librarian of the Library of Congress as of the date of the filing of this Complaint.

## PARTIES

7.      Martha-Lucia Sierra is a current employee of the Library of Congress and has been employed by the Library since April 28, 1996.  She is a resident of the Commonwealth of Virginia.  She was born in the Republic of Colombia in South America in 1954, identifies as Hispanic, and speaks both Spanish and English fluently. She carries the distinction of a Fulbright Scholar, which in addition to her exemplary performance as a professional at the Library highlights her intellectual and performance

capabilities.   Ms. Sierra also holds a USDA certification as a professional translator Spanish/English, English/Spanish.

8.      David S. Mao became the Acting Librarian of the Library of Congress in October 2015 upon the retirement of former Librarian James H. Billington and currently serves in that role.   As Acting Librarian, he is the "head of the department, agency, or unit" as that term is used in 42 U.S.C. § 2000e-16(c).

## STATEMENT OF FACTS

9.      Ms. Sierra began working for the Library as a contractor on July 14, 1993.

10.      After nearly three years as a contractor, Ms. Sierra was hired as an employee of the Library on April 28, 1996 and remains an employee of the Library as of the date of the filing of this Complaint.

11.      During all times relevant to this Complaint, Ms. Sierra was and is employed as a Management Analyst at level GS-0343-13 within the Office of Strategic Planning of the Library's Office of the Chief Financial Officer, now Office of Strategic Planning and Performance Management under the Office of the Chief of Staff.   Ms. Sierra is a career ladder GS-13/14 employee.   Ms. Sierra has served in the same position and at the same grade since May 2007, an unusually long period of time for a competent GS-13/14 career ladder professional to serve within the same grade without promotion.

12.      From May 2007 until July 2015, Ms. Sierra's immediate supervisor was Karen Lloyd, who served as Strategic Planning Officer.   Currently, Ms. Sierra's immediate supervisor is Dianne Houghton.

13.      Upon demonstration of merit, Ms. Sierra should have been promoted to the GS-14 level.

14.     Ms. Sierra's immediate supervisor, Ms. Lloyd, was responsible for rating and did in fact rate Ms. Sierra's job performance.

15.     Ms. Lloyd, as described more fully, *infra*, demonstrated bias and persistent hostility against Ms. Sierra because she is female and/or because she is Hispanic and of Colombian origin, including because Spanish is her first language.  Ms. Lloyd did not treat white male employees that she supervised in the same discriminatory manner as she treated Ms. Sierra.

16.     For example, Ms. Lloyd repeatedly criticized the way that Ms. Sierra communicates in the English language, mocked her in front of coworkers, pointed out her grammatical errors, and directed Ms. Sierra to take English classes.  Ms. Lloyd did not criticize the way that white male native English speaking employees under her supervision communicate, did not criticize their grammatical errors, did not mock them in front of coworkers, and did not direct them to take language classes.

17.     Ms. Sierra received job performance ratings of "outstanding" and "commendable" in each performance rating from years 2008 through 2014.  It was explained to Ms. Sierra, and Ms. Sierra believed based upon observing practice within the Library, that she would be promoted to the GS-14 level within two years of the commencement of her position as Management Analyst.

18.     Ms. Lloyd engaged in a persistent course of interfering with Ms. Sierra's ability to achieve promotion by "moving the goalposts" each time Ms. Sierra achieved the benchmarks Ms. Lloyd established for Ms. Sierra's promotion in the previous year.  As is demonstrated in greater detail, *infra*, Ms. Lloyd interfered with Ms. Sierra's ability to achieve promotion because of Ms. Lloyd's bias against racial minority female employees under her supervision.

19.    For example, during a May 2009 conversation about Ms. Sierra's 2008-2009 performance rating, Ms. Lloyd told Ms. Sierra that Ms. Sierra was not ready for promotion to GS-14 because she had not presented the Internal Control Program ("ICP"), for which Ms. Sierra was responsible, outside of the Library. Ms. Sierra accepted the challenge and took the initiative to plan and to present the ICP outside of the Library at the Association of Government Accountants' ("AGA") Fraud and Internal Controls national meeting in September 2009. After reporting her communication with the AGA president and the education director  to Ms. Lloyd, Ms. Lloyd took the ICP project leadership role away from her and instructed her not to contact the AGA again.  Even worse, Ms. Lloyd mocked Ms. Sierra in front of her colleagues during a September 2009 meeting organized by Ms. Sierra to rehearse for her AGA meeting presentation.  Ms. Lloyd wrongly said to Ms. Sierra in front of her colleagues that Ms. Sierra's presentation was incoherent and that it would confuse people because English is not Ms. Sierra's first language.  Attempting to mimic Ms. Sierra's way of speaking, Ms. Lloyd mockingly stated to Ms. Sierra in front of others, "You talk like 'wa, wa, wa,'" and "if I can't understand you, neither can others," clearly belittling Ms. Sierra's accent and English pronunciation and making facial and bodily expressions of mockery and disgust.  Ms. Lloyd's behavior was designed to embarrass, humiliate and demoralize Ms. Sierra in front of her colleagues because of Ms. Sierra's race and national origin.  In fact, one of Ms. Sierra's colleagues stood up and left the room because she was upset with the way in which Ms. Lloyd humiliated Ms. Sierra in front of others.

20.    Then, in 2010, after a very successful presentation of the ICP at the September 2009 AGA meeting by Ms. Sierra that drew positive attention to the Library from multiple federal agencies, Ms. Lloyd again moved the goalposts on Ms. Sierra,

downplaying Ms. Sierra's success and imposing a new requirement for promotion to GS-14 – supervision of staff – which is not a job requirement in Ms. Sierra's position.  Both of Ms. Sierra's white male co-workers are GS-14 level employees and neither of them supervises employees.

21.    Ms. Lloyd's pattern of behavior persisted throughout the period of her supervision of Ms. Lloyd and included numerous other instances of inappropriate behavior designed to harass and discriminate against Ms. Sierra because of her race and national origin.

22.    Ms. Lloyd's behavior did in fact harass and discriminate against Ms. Sierra and unreasonably interfered with her work performance because it lowered Ms. Sierra's morale in the workplace, humiliated her in front of her colleagues, made her less confident in her work, interfered with her professional development opportunities, and caused Ms. Sierra severe emotional distress including an anxiety attack while at work.

23.    Ms. Sierra's medical providers state that Ms. Sierra has experienced syncope (fainting), anxiety attacks, chest pain, mitral valve prolapse, and palpitations as apparent results of work-related stressors.  These events demonstrate that the harassment Ms. Sierra suffered at work unreasonably interfered with her work performance.

24.    Ms. Lloyd refused to approve the promotion of Ms. Sierra each time she had the opportunity to do so, from 2008 through 2015.

25.    Other examples of Ms. Lloyd's discrimination and pattern of harassment against Ms. Sierra include but are not limited to the following instances:

  a.    In 2008 and continuing through 2015, Ms. Lloyd refused to approve a detail assignment for Ms. Sierra while promptly giving detail assignments to Ms. Sierra's white male co-workers.  Ms. Lloyd gave Ms. Sierra's

African American female co-worker a detail assignment two years after the approved detail assignments for the white males.  As of the date of this Complaint, Ms. Sierra still has not been approved for a detail assignment.  The refusal to approve Ms. Sierra for detail assignment has adversely impacted her professional development.

b.      Despite Ms. Sierra's demonstrable professional-level skill in reading, writing, understanding and speaking English, Ms. Lloyd repeatedly suggested that Ms. Sierra had difficulty with English and instructed her to take English and writing classes.  Ms. Lloyd's continued insistence that Ms. Sierra has difficulty with English was designed to belittle Ms. Sierra and is indeed puzzling in light of the fact that Ms. Sierra earned a Fulbright Scholarship and frequently writes and teaches skillfully in the English language on complex topics.

c.      During private closed-door meetings with Ms. Sierra, Ms. Lloyd frequently belittled Ms. Sierra's way of writing to the point that Ms. Sierra suffered from severe anxiety and depression and exacerbation of existing medical conditions.  She also called Ms. Sierra a "traitor" during one meeting with Ms. Sierra in 2010 when Ms. Sierra was asked by the United States Embassy in Mexico to assist with an Embassy library program.  In 2011, Ms. Lloyd told Ms. Sierra that Ms. Sierra was like Jerry Sandusky (the infamous convicted former football coach) and accused Ms. Sierra of betraying her because Ms. Lloyd was upset that Ms. Sierra had been in Ms. Lloyd's supervisor's office. Ms. Lloyd further drew an offensive parallel to Latin American family hierarchical structure to attempt to demonstrate her disapproval of Ms. Sierra's having spoken with Ms. Lloyd's supervisor, who was Ms. Sierra's second-level supervisor.

d.      Ms. Lloyd also did not place the other racial minority female (Karen Walfall) under her supervision into a career ladder position such that she would not be able to achieve promotion to GS-14 at all.  Ms. Walfall eventually requested transfer within the Library because of the racial hostility she perceived Ms. Lloyd to perpetuate against her and Ms. Sierra.

e.      During ICP Coordinators meetings, Ms. Lloyd often disingenuously asked the audience if they could understand what Ms. Sierra was saying.  Others reported they could indeed understand Ms. Sierra, indicating that Ms. Lloyd's complaints about Ms. Sierra's accent were disingenuous and intended to belittle Ms. Sierra and harass her because of her race (Hispanic) and national origin (Colombian).

f.      When Ms. Sierra asked Ms. Lloyd to give specific examples to Ms. Sierra of how Ms. Sierra's English skills could improve, Ms. Lloyd was unable to provide specific examples to Ms. Sierra.

g.      Until Ms. Sierra filed the instant complaints of discrimination and harassment, Ms. Lloyd never assigned Ms. Sierra to act on her behalf when she was away.  Ms. Lloyd routinely asked white male employees to act on her behalf while she was away.  Denial of this job task limited Ms. Sierra's exposure to relevant experience valuable to her career.

h.      Ms. Lloyd frequently also acted in more subtle ways that were nonetheless designed to harass Ms. Sierra and limit Ms. Sierra's employment opportunity.  For example, in November 2013, Ms. Lloyd gave Ms. Sierra an unreasonable and arbitrary deadline that she knew was impossible for Ms. Sierra

to achieve given Ms. Sierra's schedule at that time.  Ms. Lloyd also intentionally excluded Ms. Sierra from emails she sent to her other three subordinates.

        i.      Ms. Lloyd would not permit Ms. Sierra to participate in the Library's Celebration of Mexico event unless she first completed a task for which Ms. Lloyd set an arbitrary and unreasonable deadline.

26.      Ms. Sierra filed an Allegation of Discrimination on December 27, 2013 and then a Formal Complaint of Discrimination in the Library's Equal Employment Opportunity Complaints Office on April 9, 2014, which was formally accepted by the Library on May 1, 2014.  Since then, Ms. Sierra has participated in the investigatory and administrative process.

27.      Ms. Lloyd was ultimately transferred out of the Office of Strategic Planning to another office within the Library of Congress.  Following her transfer Dianne Houghton, under a "Not to Exceed" or "NTE" job status, was placed in the Office of Strategic Planning.  On information and belief, her job description was limited to strategic planning and did not encompass the internal controls program that Ms. Sierra performed.  Regardless, Ms. Houghton was permitted to provide Ms. Sierra's performance evaluation for 2016 and used that opportunity to mirror Ms. Lloyd's criticism of Ms. Sierra's writing even without access to sufficient examples of Ms. Sierra's work product necessary for making such an evaluation.

28.      After making her complaints of discrimination, Ms. Sierra again requested promotion in 2014, 2015 and 2016.  In each year since her complaints have been filed, and knowing of her complaints, the Library has denied her promotion to GS-14 level.

29.      Because Ms. Sierra is qualified (and has been qualified for at least 7 years) for promotion to the GS-14 level, the Library's refusal to promote Ms. Sierra even after

assigning her a new supervisor raises a strong inference of retaliation against Ms. Sierra for having opposed the discrimination and harassment against her by initiating complaints and participating in the administrative prosecution of her claims.

30.    As of the date of this Complaint, the Library continues to refuse to promote Ms. Sierra to the GS-14 level.

**COUNT ONE (Hostile Work Environment)**
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a)

31.    The foregoing allegations are hereby restated and re-alleged and incorporated herein by reference as if fully set forth herein.

32.    Ms. Sierra is a Latina female, identifies as Hispanic, and was born in the South American Republic of Colombia.

33.    As more fully described, *supra*, Ms. Sierra has been subjected to unwelcome harassment by her supervisor because of her race (Hispanic), national origin (Colombian), and/or sex (female).

34.    The harassing conduct directed at Ms. Sierra was severe and persistent such that it created a hostile work environment that unreasonably interfered with Ms. Sierra's work performance.

35.    Defendant is liable to Ms. Sierra for damages resulting from the harassment she has suffered because Ms. Sierra's supervisor acts under the authority of the Defendant and the Defendant is liable for the actions of the Library's supervisory employees under the doctrine of *respondeat superior*.

36.    Ms. Sierra has suffered severe emotional distress and economic loss as a direct and proximate result of the harassment directed at her.   The hostile work environment she has suffered has contributed to Defendant's failure to promote her to

GS-14 level and has caused her to use her available sick leave, causing her economic

loss, and has cost her multiple career growth opportunities.

### COUNT TWO (Disparate Treatment – Failure to Promote)
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(a)

37.     The foregoing allegations are hereby restated and re-alleged and

incorporated herein by reference as if fully set forth herein.

38.     Ms. Sierra is a Latina female, identifies as Hispanic, and was born in the

South American Republic of Colombia.

39.     Ms. Sierra was performing her job at or above expectations and was a

demonstrably good employee without a disciplinary record.

40.     Despite her qualifications and achievements that merited promotion to the

GS-14 level, Defendant has refused to promote Ms. Sierra from the GS-13 level to the

GS-14 level because of Defendant's discriminatory bias against Ms. Sierra because she is

Hispanic, of Colombian origin, and a woman.

41.     Because of Defendant's discriminatory failure to promote Ms. Sierra, Ms.

Sierra has suffered loss of income, loss of paid leave, loss of benefits, loss of economic

opportunity, and severe emotional distress.

### COUNT FOUR (Retaliation)
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3(a) & 2000e-16(a)

42.     The foregoing allegations are hereby restated and re-alleged and

incorporated herein by reference as if fully set forth herein.

43.     Ms. Sierra engaged in protected activity beginning in 2013 and continuing

to the present when she opposed discrimination and harassment in her workplace by

filing a complaint alleging harassment and disparate treatment and testifying about her

supervisor's discriminatory and harassing conduct. She has continued to prosecute her claim to the present, participating in the process at every step.

44. Because of the protected activity described above, Defendant again refused to promote Ms. Sierra from GS-13 to GS-14 level in each year from 2014 through the present despite Ms. Sierra's having merited promotion.

45. Because of Defendant's retaliatory failure to promote Ms. Sierra, Ms. Sierra has suffered loss of income, loss of paid leave, loss of benefits, loss of economic opportunity, and severe emotional distress.

## COUNT FIVE (Library of Congress Regulations)
Library of Congress Regulations, LCR 2010-2, LCR 2023-1 and LCR 2023-2

46. The foregoing allegations are hereby restated and re-alleged and incorporated herein by reference as if fully set forth herein.

47. Pursuant to its regulations and agency announcements, the Library of Congress does not tolerate discriminatory harassment of any type. The Library claims to be committed to preventing and addressing all forms of discriminatory harassment on the basis of race, color, national origin, religion, sex, age, disability, sexual orientation or sexual identity. Not only does such harassment violate the law, but it also constitutes misconduct under Library of Congress Regulations, namely, LCR 2010-2 "Policy of Non-Discrimination in Library Employment and Staff Relations"; LCR 2023-1, "Personal Conduct and Personal Activities of the Staff of the Library of Congress: Purpose, Policy, and General Standards of Conduct"; and 2023-2, "Conduct in Official Positions."

48.     As a result of the Defendant's actions, Plaintiff has suffered, and will continue to suffer, both economic and non-economic losses, emotional distress, and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays unto the Court to grant her judgment and relief as follows:

1.     For appropriate economic damages against the Defendant, including wages, sick leave, and other benefits that would have been earned or otherwise not wasted by Plaintiff but for Defendant's harassment and discriminatory failure to promote Plaintiff;

2.     For appropriate compensatory damages against the Defendant in an amount to be determined at trial;

3.     Back pay, in an amount to be determined at trial, which accounts for the Defendant's failure to promote the Plaintiff but for the Defendant's discriminatory conduct.

4.     Front pay, in the event promotion to GS-14 is not granted.

5.     For appropriate equitable and injunctive relief against the Defendant as may be permitted by law;

6.     For an award of reasonable attorney's fees and expenses incurred by the Plaintiff against the Defendant; and

7.     For such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully Submitted,

This the 9th day of September, 2016, by

**ACKERMAN BROWN, PLLC**

_____*Christopher M. Brown*_____
Christopher Mayfield Brown, Esq.
D.C. Bar No. 502421
2101 L Street NW, Suite 440
Washington, D.C. 20037
(202) 393-5428 (telephone)
(202) 355-6489 (facsimile)
chris.brown@ackermanbrown.com
*Counsel for Plaintiff*