**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARTHA-LUCIA SIERRA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 16-1804 (RC) |
| | : | | |
| v. | : | Re Document No.: | 24 |
| | : | | |
| CARLA HAYDEN,[1] *in her official capacity as* | | | |
| *Librarian of Congress*, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

**Granting Defendant's Motion to Dismiss; Granting in Part and Denying in Part Defendant's Motion for Summary Judgment**

## I. INTRODUCTION

On September 9, 2016, Library of Congress ("LOC") employee Martha-Lucia Sierra brought this employment discrimination action against Carla Hayden in her official capacity as Librarian of Congress. Ms. Sierra alleged discriminatory non-promotions beginning in 2008, Compl. ¶¶ 37–41, ECF No. 1, and from 2014 to 2016, *id.* ¶¶ 42–45. She additionally contended that her supervisor's "unwelcome harassment . . . because of her race (Hispanic), national origin (Colombian), and/or sex (female)" created a hostile work environment. *Id.* ¶ 33. Defendant moved to dismiss both Plaintiff's 2008 to 2012 and 2014 to 2016 non-promotion claims. *See generally* Def.'s Partial Mot. Dismiss, ECF No. 4. On June 1, 2017, this Court granted Defendant's motion, finding that Ms. Sierra had failed to timely administratively exhaust both her 2008 to 2012 complaints and her failure-to-promote claims from 2014 to 2016 with the LOC.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Carla Hayden for David Mao as Defendant.

*See Sierra v. Hayden*, 254 F. Supp. 3d 230, 233 (D.D.C. 2017). Because Defendant had not moved to dismiss the 2013 non-promotion, this Court declined to move *sua sponte* to dismiss that claim. *Id.* at 243. The Court noted, however, that Ms. Sierra's 2013 non-promotion claim was "likely dismissible because she did not seek out a promotion" in that year. *Id.*

After completing discovery, Defendant brought a Rule 12(b)(6) motion to dismiss Ms. Sierra's remaining 2013 non-promotion claim and a motion for summary judgment on her hostile work environment claim. Def.'s Mot. Dismiss and Mot. Summary J. ("Def.'s Mot."), ECF No. 24. Because this Court finds that Plaintiff has not established a plausible 2013 non-promotion claim, that claim is dismissed. In addition, the Court will grant in part and deny in part Defendant's motion for summary judgment.

## II. REGULATORY AND PROCEDURAL BACKGROUND

Title VII of the Civil Rights Act of 1964 protects employees of the Library of Congress, providing that "[a]ll personnel actions affecting [LOC] employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). A party must fulfill several administrative prerequisites before she may file a Title VII lawsuit in a federal district court. *See Brown v. GSA*, 425 U.S. 820, 832 (1976). As detailed in this Court's June 1, 2017 Memorandum Opinion, the specific regulations that apply to the LOC differ from many other federal agencies. *See* 29 C.F.R. § 1614.103(d)(3). Under Title VII, the Librarian of Congress is to exercise Equal Opportunity Employment Commission authority over the LOC, *see* 42 U.S.C. § 2000e–16(b), which the Librarian has done via LOC regulations, *see* LCR 2010-3.1 § 1, ECF No. 4-3. The LOC regulations require a staff member "who believes that []she has been, or is being discriminated against" to "notify and consult with a Counselor not later than 20 workdays after the date of the

alleged discriminatory matter." *Id.* at § 6(B). Subject to a limited number of exceptions, this requirement must be satisfied before a plaintiff may file a lawsuit in federal district court. *Id.* at § 4(B); *see also Nichols v. Billington*, 402 F. Supp. 2d 48, 69 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 2018044 (D.C. Cir. Mar. 7, 2006).

Here, Plaintiff filed several administrative complaints related to her non-promotion claims. The Court has already determined that Plaintiff's employment discrimination complaints for non-promotions before 2012 "did not adhere to the black letter of the library regulations." *Sierra*, 254 F. Supp. 3d at 239. Because she did not timely file within the LOC regulations' twenty workday requirement and because she also did not make a request for an extension of the deadline upon prior request, *see* LCR 2000–3.1 § 4(B), Ms. Sierra missed the regulatory deadline. *See id.* The Court thus concluded that Ms. Sierra did not timely exhaust her pre-2012 administrative claims, that the LOC did not waive its non-exhaustion defense, and that Ms. Sierra failed to demonstrate that she was entitled to equitable tolling on her claims for the years 2008 through 2012. *See id.* at 239–43. The Court also considered Plaintiff's failure-to-promote claims that occurred from 2014 to 2016. *See id.* at 243–44. Finding that Ms. Sierra did not timely exhaust her 2014, 2015, and 2016 administrative claims of alleged non-promotion, it granted Defendant's partial motion to dismiss these claims. *Id.* at 244. Finally, the Court considered Ms. Sierra's claim for discriminatory non-promotion in 2013. *Id.* at 244–45. Because Defendant did not move to dismiss Plaintiff's 2013 non-promotion claim or brief the issue, the Court declined to dismiss the claim *sua sponte* under Rule 12(b)(6). *Id.* at 245. The Court noted, however, that the claim was likely dismissible because Plaintiff did not seek out a promotion in 2013. *Id.*

On December 10, 2018, Defendant filed a second motion to dismiss addressing the 2013 non-promotion claim. *See generally* Def.'s Mot. In this same filing, Defendants moved for summary judgment on Plaintiff's hostile work environment claim. *See id.* These motions are now ripe for the Court's consideration.

## III. FACTUAL BACKGROUND[2]

Because this Court has already dismissed all of Plaintiff's claims other than Ms. Sierra's 2013 discriminatory non-promotion claim and hostile work environment claim, *see Sierra*, 254 F. Supp. 3d at 235 (discussing discriminatory and retaliatory refusal to promote as well as "other discriminatory actions"), the instant description of the facts will focus on, first, the employee-supervisor relationship in the year 2013, and second, details from the record that are relevant for Plaintiff's discriminatory hostile work environment claim.

Ms. Sierra worked as a contractor at LOC from 1993 to 1996, Pl.'s Opp'n Def.'s Mot. ("Pl's Opp'n") 2–3, ECF No. 27, and was then hired as a Paper Conservator for the LOC's Conservation Office in April 1996, Def.'s Mot. 2; Pl.'s Opp'n 3.[3] In 2007, Plaintiff applied for a career ladder GS-13/14 management analyst position in the LOC's Strategic Planning Office

---

[2] In general, a court will not accept facts from a defendant's filings in a motion to dismiss at the pleading stage. *See Angelex Ltd. v. United States*, 123 F. Supp. 3d 66, 88 n.11 (D.D.C. 2015). At the motion for summary judgment stage, however, a court may look beyond the complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). Because the pending motion includes both a motion to dismiss and a motion for summary judgment, the Court's reporting of facts incorporates facts from beyond the four corners of the complaint. However, in deciding Defendant's motion to dismiss, it considers only facts from Plaintiff's complaint or "documents upon which the plaintiff's complaint necessarily relies." *Angelex Ltd.*, 123 F. Supp. 3d at 88 n.11.

[3] The Court cites to original pagination when it is available. For documents that were not originally paginated, the Court cites to the ECF page numbers. Because the parties did not consistently label their exhibits, the Court refers to them using the ECF numbers.

("SPO"). Compl. ¶ 11. She was selected for the management analyst position after an interview by Karen Lloyd, who became Ms. Sierra's immediate supervisor from May 2007 to July 2015. *See* Pl.'s Opp'n 3; Def.'s Statement Material Facts ("Def.'s SMF"), ECF No. 24-1 ¶¶ 4, 6. Ms. Sierra was hired into this position at the GS-13 level. Def.'s SMF ¶ 4. As a "career ladder position" employee, Ms. Sierra was eligible for non-competitive promotion to the GS-14 if she demonstrated an ability to perform at that level. *Id.* ¶ 12; *see also* Pl.'s Opp'n 4–5 ("[I]n order to move up in a career ladder position, 'an individual must demonstrate that they are performing satisfactorily at the next higher grade level for a period of three (3) months.'" (quoting Def.'s Resps. Pl.'s Interrogs. 5, ECF No. 27-7)). Ms. Sierra has not been promoted to the GS-14 level since she was hired into the management analyst position in 2007. Pl.'s Opp'n 3 (citing Compl. ¶ 11).

Ms. Sierra's complaint alleges discrimination based on race (Hispanic), sex (female), and national origin (Colombian). Compl. ¶ 1. Because Plaintiff alleges discriminatory conduct over a period of time, as opposed to making a claim derived from one or more discrete acts, the Court will summarize several categories of issues that Ms. Sierra describes: shifting work performance standards; presentations and meetings; interactions within the office and at external events; and one-on-one conversations with Ms. Lloyd.

### A. Shifting Work Performance Standards

According to Ms. Sierra, her performance was continually found inadequate, even when she "rose to the challenge[s]" that Ms. Lloyd laid out for her. Pl.'s Opp'n 5. First, in Plaintiff's 2008–2009 performance evaluation, Ms. Sierra was told that she needed to "take the Internal Control Program ("ICP") out of the Library" to be ready for her GS-14 promotion. *Id.* at 4 (citing Sierra Aff. 4, ECF No. 27-8). But even when Ms. Sierra performed this task and was

invited to participate at the 2016 Association of Government Accountants ("AGA") Fraud and Internal Controls National Meeting, Plaintiff asserts that Ms. Lloyd did not recognize her accomplishment. *Id.* at 5–6. Instead, according to Plaintiff, Ms. Lloyd "took the project leadership role away" and told Ms. Sierra not to contact the AGA. *Id.* at 6 (citing Sierra Aff. 4). Ms. Lloyd contests this allegation, averring that she did not strip Ms. Sierra of any leadership role. *Id.* at 6 (citing Lloyd Dep. 125:22–126:9, ECF No. 27-4).

In 2010, when Plaintiff again asked about a possible promotion based on her work with the ICP, Ms. Lloyd allegedly characterized Ms. Sierra's work as "fine" but told her that she was not ready for a promotion because she lacked supervisory skills. *Id.* at 11 (citing Sierra Dep. 89, ECF No. 27-3). Again, Ms. Lloyd disputes this account and states that she "could not have said this because" of her knowledge that the position is non-supervisory. Lloyd Aff. 7, ECF No. 27-6. Ms. Sierra offers that she worked to redress this issue in two ways. First, she enrolled in "Management Concepts," a professional training resource for the ICP, to gain supervisory training. Pl.'s Opp'n 12. Second, she began managing a LOC intern and met weekly with Ms. Lloyd "to discuss her task as a supervisor." *Id.* (citing Sierra Aff. 6). According to Ms. Sierra, Ms. Lloyd abruptly fired the intern before the end of the intern's assignment term and told Plaintiff that she lacked supervisory skills. *Id.* (citing Sierra Dep. 92; Sierra Aff. 7). According to Ms. Lloyd, it was Ms. Sierra who suggested that she fire the intern. Lloyd Aff. 8. There is no evidence of further discussion of supervisory skills development or of the importance of such skills for promotion.

The next year (2011), at her annual performance evaluation, Ms. Sierra states that she was informed for the first time that her writing skills were deficient. Pl.'s Opp'n 12 (citing Sierra Dep. 100; Lloyd Dep. 119:5–6); *see also* Def.'s SMF ¶ 17 (citing Compl. ¶¶ 16, 25(b)).

According to Ms. Sierra, Ms. Lloyd's critique of her writing "perplexed" her because coworkers generally complimented her work. Pl.'s Opp'n 12–14 (citing Morse Dep. 57:3–9, 57:10–15, ECF No. 9). Ms. Walfall, a coworker, affirms that Ms. Sierra's work was "usually well-written" and did not require any more editing than that of her coworkers. Walfall Aff. 3, ECF No. 27-14. Ms. Morse, a coworker who reviewed Plaintiff's work under the office's peer review system, found Ms. Sierra's writing to be grammatically sound and "fine, though perhaps a bit verbose." Pl.'s Opp'n 13 n.12; *see also* Morse Dep. 55:19–57:9. Mr. Lambert, a third coworker, suggests that there were more issues with Ms. Sierra's writing, stating that she has "some messaging challenges with what message is being communicated to who[m]." Lambert Dep. 22:15–17, ECF 31-4.[4]

Ms. Sierra ultimately enrolled in writing courses after Ms. Lloyd requested that she "take 'writing courses' or 'English courses'" through the LOC online training portal, Def.'s Mot. 13 (quoting Compl. ¶ 16, 25(b); Sierra Dep. 105:20–106:8), because her writing was "not clear and concise" and required multiple rounds of edits, *id.* (quoting Lloyd Dep. 61:8–10, 80:7–10). Ms. Sierra characterizes many of these edits as "stylistic," citing examples such as replacing the phrase "Good day" with "Dear Internal Control Program Accountable Officials." Pl.'s Opp'n 13 & n.11. Nonetheless, Ms. Sierra completed five or six online classes concerning English, in the sense of effective writing skills and not in the sense of learning to speak the language. Sierra Dep. 107:7–25, 109:14–17, ECF No. 24-3. She completed these courses in addition to her

---

[4] The full Lambert Deposition was inadvertently not attached to the motion for summary judgment that Defendant uploaded to the Court's Electronic Filing System. Instead, it was subsequently attached to Defendant's Reply. *See* Def.'s Reply 1 n.2, ECF No. 31. Although the Court will not consider arguments or claims raised for the first time in a reply, *see In re Asemani,* 455 F.3d 296, 300 (D.C. Cir. 2006), because the Lambert Deposition's missing pages include no new arguments or claims, it will consider Mr. Lambert's full testimony.

regular workload, although Ms. Sierra was permitted to take these courses at her desk during work hours and does not appear to have been expected to complete them on her own time. *See id.* at 109–11.

### B. Presentations and Meetings

Several incidents occurred at LOC presentations and meetings. The earliest reported incident occurred on September 15, 2009, when Plaintiff was practicing for a presentation the next day at the Association of Government Accountants' Internal Control Program/Fraud Conference. Def.'s Mot. 10 (citing Sierra Dep. 38:4-44:7, ECF No. 24-4); *see also* Pl.'s Opp'n 7. According to Plaintiff, Ms. Sierra had invited several colleagues to help her polish her presentation. Pl.'s Opp'n 6–7 (citing Sierra Dep. 43–44; Sierra Aff. 4–5). Plaintiff avers that Ms. Lloyd was late to the rehearsal, "which was 'disruptive,'" and then, upon her arrival, frequently interrupted Ms. Sierra's presentation and critiqued it as "incoherent." Def.'s Mot. 10 (quoting Sierra Dep. 44:8–17); *see also* Pl.'s Opp'n 6–8. At this same rehearsal, Ms. Lloyd is alleged to have mocked Ms. Sierra's accent with the comment, "you're talking like wa wa wa." Def.'s Mot. 10 (quoting Sierra Dep. 44:21); *see also* Pl.'s Opp'n 7. Plaintiff additionally proffers that these comments were made "with disgust in her [Ms. Lloyd's] face." Pl.'s Opp'n 7 (citing Sierra Dep. 44). An employee at the LOC Office of Opportunity, Inclusiveness, and Compliance, Ida Hernandez, corroborates Ms. Sierra's account. Ms. Hernandez attended Ms. Sierra's rehearsal at Plaintiff's personal invitation and states that Ms. Lloyd was "harshly criticizing Plaintiff's presentation" and "aggressively harass[ing] Plaintiff by interrupting and bombarding Plaintiff with criticism while she was practicing." *Id.* at 8 (quoting Hernandez Aff. 3, ECF No. 27-12). In addition, Ms. Sierra avers that, during multiple other presentations and meetings, Ms. Lloyd asked others in the room if they understood what Plaintiff was saying.

Def.'s Mot. 11; Pl.'s Opp'n 18.  Ms. Sierra specifically points to her October 2012 presentation during a LOC class as a time when Ms. Lloyd frequently interrupted Ms. Sierra and questioned whether the class understood her.  Pl.'s Opp'n 17 (citing Lloyd Aff. 8), 38.

Two coworkers in the LOC's Office of Strategic Initiatives ("OSI") sustain Ms. Sierra's account.  According to Carolyn Claypoole, who is not supervised by Ms. Lloyd and who serves as an internal control program coordinator for OSI, Claypoole Aff. Addendum 4, ECF No. 27-15, Ms. Lloyd "continually" interrupted Ms. Sierra at Internal Control Program ("ICP") meetings in 2010 and 2012, *id.* at 3.  Ms. Claypoole labels Ms. Lloyd's interruptions of Ms. Sierra's presentations as "blatantly racist."  Pl.'s Opp'n 37 (quoting Claypoole Aff. 4).  Ms. Sierra also specifically underscores December 2, 2010, March 7, 2012, June 6, 2012, and August 8, 2012, as "a few dates where Ms. Lloyd interrupted Ms. Sierra in the ICP meetings."  *Id.* at 37 n.22.  Beyond these dates, the record does not indicate what proportion of the monthly ICP meetings involved such interruptions.  Ms. Morse separately concurs with Plaintiff's account that, on multiple occasions, Ms. Lloyd asked Ms. Sierra to repeat herself during staff meetings in ways that Ms. Morse did not find necessary.  Morse Dep. 53:14–55:4.  Furthermore, Ms. Claypoole and Plaintiff each contend that Ms. Lloyd never similarly interrupted white, male employees whom she supervised.  *See* Pl.'s Opp'n 37; *see also id.* at 9 (citing Hernandez Aff. 7; Page Aff. 3, ECF 27-13).  However, Tom Lambert, a third supervisee of Ms. Lloyd, avers that Ms. Lloyd critiqued the presentations of all her staff.  *See* Lambert Aff., ECF No. 24-13 ("Karen Lloyd . . . regularly attended presentations given by her staff members, including me, took notes on those presentations, and provided the presenters with critiques and criticisms.").

### C. Interactions Within the Office and at External Events

Ms. Sierra also describes a number of more specific interactions with Ms. Lloyd that took place both in the office and at external events. She contends that Ms. Lloyd tended to at times "unnecessarily separate[] Plaintiff from some groups, and other times unnecessarily lumped her in with other groups," Pl.'s Opp'n 15 (citing Sierra Dep. 117), and "took many actions to subtly and overtly humiliate Ms. Sierra," *id.* at 43.

First, Plaintiff states that Ms. Lloyd disfavored Ms. Sierra and did not appoint Ms. Sierra to be her subordinate in charge when Ms. Lloyd was away from the office unless Plaintiff "was the **only** one available." *Id.* at 16 (citing Lloyd Dep. 84); *see also* Walfall Aff. 5, ECF No. 27–14 (stating that Ms. Walfall could not recall Ms. Sierra ever acting on Ms. Lloyd's behalf and noting that Ms. Walfall was only asked to act on Ms. Lloyd's behalf "if the following conditions were met: (1) [Ms. Sierra] was the only one in the office other than me [and] (2) I was the only person in the office"). Ms. Lloyd contends, however, that she did not select Plaintiff to supervise in her absence because Ms. Sierra's position in the ICP tended to receive fewer questions than other areas of the office, and so Ms. Sierra's area of expertise was less germane. Def.'s Mot. 16–17; *see also* Letter Re Decision of the Office of Opportunity, Inclusiveness and Compliance 7–8, ECF No. 24-10 (citing Ms. Lloyd's explanation that she "put the individual in charge who has the most experience with regard to the areas in which issues or questions are expected to come up and will need to be resolved").

Second, Ms. Sierra argues that Ms. Lloyd treated her differently from other employees because Ms. Lloyd did not approve a detail opportunity for Ms. Sierra to work at an office outside of the LOC. During Ms. Lloyd's tenure as Ms. Sierra's supervisor, other employees whom Ms. Lloyd supervised went on details. *See* Def.'s SMF ¶ 17 (citing Compl. ¶ 25(a)).

According to Ms. Sierra, she first requested a detail during her 2013 performance review, but Ms. Lloyd was unsupportive of her detail request during her remaining two years supervising Ms. Sierra. Def.'s Mot. 16. Although Ms. Lloyd "never explicitly told Plaintiff [that] she refused to allow [Ms. Sierra] to be detailed for an assignment, she continuously 'pushed back' the prospective detail under the guise of Plaintiff having 'a lot of work.'" Pl.'s Opp'n 20 (quoting Sierra Dep. 148). In addition, Ms. Sierra avers that Ms. Lloyd actively provided detail opportunities for a white, male coworker, Mr. Lambert, *id.* at 21 (citing Lambert Dep. 25:18–26:1), whereas Ms. Lloyd advised Plaintiff that she needed to locate her own "developmental assignment," *id.* at 20 (quoting Def.'s Resp. Pl.'s Interrogs. 8). Although Ms. Lloyd disputes this account and states that Mr. Lambert located his own detail, *see* Lloyd Dep. 88:7–90:8, Mr. Lambert's own testimony supports Ms. Sierra's account, *see* Lambert Dep. 25:20–26:8, ECF No. 27-25 (stating that he never sought a detail opportunity and that Ms. Lloyd approached him about a "developmental" detail).

Plaintiff also proffers that Ms. Lloyd's communications and protocols within SPO represent Defendant's differential treatment of Ms. Sierra as compared to Ms. Lloyd's other supervisees. Ms. Sierra notes Ms. Lloyd's failure to include her on two SPO internal emails, one a notice that Ms. Lloyd was ill on November 25, 2013, and the other an email regarding the death of a coworker's mother on December 5, 2013. Def.'s Mot. 18. Plaintiff avers that these omissions represent an attempt to exclude Ms. Sierra from office communications. Pl.'s Opp'n 42–43. Defendant proffers a non-discriminatory explanation for both omissions. Ms. Lloyd contends that she did not include Plaintiff on the November 25, 2013, email because it "had nothing to do with the content of the internal control program that Sierra was responsible for," Def.'s Mot. 18 (citing Lloyd Dep. 86:15–17; Def.'s Suppl. Interrog Resp. 7-9-18, ECF 24-17),

and that her failure to include Ms. Sierra on the December 5, 2013, email was inadvertent, *id.* (citing Def.'s Suppl. Interrog. Resp. 7-9-18).

Ms. Sierra additionally suggests that Ms. Lloyd treated her differently by restricting her communications with Chief Financial Officer Jeff Page. In approximately March 2010, Ms. Lloyd began "pre-screening" all communications between Ms. Sierra and Mr. Page. Def.'s Mot. 12; *see also* Pl.'s Opp'n 39. According to Plaintiff's deposition, this restriction did not affect Ms. Sierra's ability to complete her work duties. *See* Def.'s Mot. 12 (citing Sierra Dep. 76:2–8). However, it did not apply to any of Ms. Lloyd's other supervisees, male or female. Pl.'s Opp'n 39; *see also* Def.'s Mot. 12 (citing Sierra Dep. 75:21–23). Ms. Lloyd states that she expects all her supervisees to brief her or her representative before going to the CFO and that she expects all staff to inform her should the CFO contact them directly. Lloyd Aff. 14. Nothing in the record specifically explains why Ms. Lloyd restricted Ms. Sierra's communications in this manner.

Finally, Ms. Sierra points to Ms. Lloyd's comments and conduct towards her in group settings. Plaintiff highlights two incidents. First, at an unidentified time, Plaintiff alleges that Ms. Lloyd compared a sweater that Ms. Sierra was wearing to the LOC's carpet. *See* Def.'s Mot. 20 (quoting Sierra Dep. 78:15–16). Plaintiff argues that this comment was "meant to embarrass her (Sierra) because 'everybody knew that nobody liked the carpet.'" *Id.* (quoting Sierra Dep. 78:11). She contends, moreover, that Ms. Lloyd was judgmental about her clothing on multiple occasions and would look at "Plaintiff's attire from top to bottom in a judgmental fashion" when Ms. Sierra arrived at the office each morning. Pl.'s Opp'n 14 (quoting Sierra Dep. 79). Second, in 2011, Ms. Lloyd and Ms. Sierra were attending an internal control conference together and conversing with other attendees during a break in proceedings. Pl.'s Opp'n 43. In the presence of this group, Plaintiff alleges that Ms. Lloyd did not permit Ms. Sierra to excuse herself to use

the restroom, saying in front of the other attendees, "[n]o, you go to the ladies' room after the session is over, and you go to the second floor" restroom, which was not the facility used by others at the conference. *Id.* (quoting Sierra Dep. 83).

### D. One-on-One Communications

In addition, Ms. Sierra describes a series of one-on-one interactions with Ms. Lloyd as further support for her discriminatory hostile work environment claim.

#### 1. Private Communications

Ms. Sierra contends that Ms. Lloyd subjected her to offensive comments in private conversations between them. In 2010, after Ms. Sierra was asked to assist with a teleconference involving the American Embassy in Mexico, Ms. Lloyd allegedly became angry that Ms. Sierra's help had been requested and called her a "traitor," Pl.'s Opp'n 9 (citing Sierra Dep. 63–66; Sierra Aff. 12; Walfall Aff. 3), warning her that she should "tell [her] friends not to give [Plaintiff's] name for any other projects," *id.* at 10 (citing Sierra Dep. 70; Sierra Aff. 12). Plaintiff alleges that Ms. Lloyd's lack of support forced her to turn down the opportunity. *See id.* at 9. Ms. Lloyd denies any recollection of this incident. *Id.* at 10 (citing Def.'s Resp. Pl.'s Interrogs. 9; Lloyd Dep. 130:15–131:4). Approximately one month later, Ms. Sierra avers that Ms. Lloyd again raised the incident and compared Plaintiff to Jerry Sandusky, a notorious child molester, during her performance evaluation, which Ms. Lloyd similarly denies. *Id.* (citing Sierra Dep. 73–74; Sierra Aff. 17; Lloyd Dep. 131:5–131:21). And on November 18, 2011, Ms. Sierra alleges that Ms. Lloyd chastised her for going to talk to Mr. Page and referred to her as a "betrayer" for her conduct. Pl.'s Opp'n 40 (citing Sierra Aff. 8). Plaintiff further contends that, during this same conversation, Ms. Lloyd invoked matrilineal concepts in a way that was offensive and disrespectful of her culture. *See id.*; Def.'s Mot. 20.

In addition, Ms. Sierra argues that the interaction centering on the event with the American Embassy in Mexico is part of a pattern: Ms. Lloyd "seemed to specifically disdain when Ms. Sierra would participate in events involving other Latin American countries." Pl.'s Opp'n 40. For instance, when Ms. Sierra asked to participate in the LOC's 2013 "Celebration of Mexico" event, she argues that Ms. Lloyd suddenly required her to complete a "non-urgent assignment," such that Plaintiff could only attend during her lunch break. *Id.* at 41; *see also* Compl. ¶ 25(i). Defendant contests this reporting, asserting that the task in question was the preparation of the Internal Control Program Annual Report, which was a major part of Ms. Sierra's professional duties each year. Def.'s Mot. 14 (citing Sierra Dep. 160:8, Lloyd Aff. ¶ 18). Ms. Lloyd further proffers that she was in fact quite supportive of Ms. Sierra's participation in the event. *See id.* at 15 (quoting Nov. 23, 2018 Email from Lloyd, ECF No. 31-1 ("Thank you for selecting Martha-Lucia to join your team as the Library celebrates Mexico. I am certain she will add value to the program.")).

## 2. Staff Communications

Finally, Plaintiff argues that Ms. Lloyd's ongoing interactions with her staff contributed to a hostile work environment. For instance, Plaintiff argues that Ms. Lloyd "frequently showed favoritism towards the other members of the office, particularly the two white males," as was the case when she "arbitrarily changed" Plaintiff's May 23, 2011, meeting to an earlier time in favor of one of the white male employees. Pl.'s Opp'n 42. Ms. Lloyd's supervisor, Jeff Page, confirms this account, stating that he "found that Ms. Lloyd was often more critical of the [Plaintiff] than of other members of Ms. Lloyd's staff. . . . [and] [m]ale employees generally seemed to be treated with more respect than the women who were supervised by Ms. Lloyd." Page Aff. 3. Ms. Sierra's coworker, Ms. Walfall, also separately alleged that Ms. Lloyd was

creating a hostile work environment, as documented in an email chain between Mr. Page and April McCarty, the LOC's Senior Employee Relations Specialist. Pl.'s Opp'n 20 (citing Jan. 2, 2019 Email from McCarty, ECF No. 27-17). This environment was so stressful that "it overwhelmed Plaintiff, to the point where Plaintiff fainted while at work." *Id.* at 15 (citing Morse Dep. 85:16–87:2).

The question facing this Court is whether the incidents that Ms. Sierra documents amount to a cognizable claim for, first, discriminatory and retaliatory non-promotion in 2013 and, second, a discriminatory hostile work environment.

## IV. LEGAL STANDARD

### A. Rule 12 Motion

Defendant brings a Rule 12 motion that was originally styled as a Rule 12(b)(6) motion to dismiss Plaintiff's 2013 non-promotion claim.[5] This Court will first address why it treats this motion as a Rule 12(b)(6) motion and then describe the controlling legal standard.

#### 1. Second Rule 12(b)(6) Motion

The plain text of the Federal Rules of Civil Procedure might seem to disallow a second Rule 12(b)(6) motion. Rule 12(g)(2) states that "a party that makes a motion under . . . [R]ule [12] must not make another motion under this rule raising a defense or objection that was

---

[5] Defendant originally filed its motion as a second Rule 12(b)(6) motion to dismiss. *See generally* Def.'s Mot. Defendant's reply subsequently "acknowledge[d] that its dispositive motion, while inadvertently styled under Rule 12(b)(6), should have been brought under Rule 12(c)" as a motion for judgment on the pleadings. Def.'s Opp'n 1 n.1. This Court disagrees that the dispositive motion is properly construed as a Rule 12(c) motion. Because Defendant has not filed an answer, the pleadings are not closed. *See Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 60 (D.D.C. 2007) ("Pleadings are closed within the meaning of Rule 12(c) if no counter or cross claims are at issue when a complaint and an answer have been filed." (citing Fed. R. Civ. P. 7(a))). A 12(c) motion for judgment on the pleadings is thus premature. As discussed *infra* Section IV.A.1, this Court concludes that it may address Defendant's motion as a second Rule 12(b)(6) motion to dismiss.

available to the party but omitted from its earlier motion," unless one of the exceptions provided in Rule 12(h)(2) or (3) applies. Fed. R. Civ. P. 12(g)(2). Here, Defendant already brought one 12(b)(6) motion to dismiss and this Court's June 2017 Memorandum Order found that Plaintiff's original complaint alleged a claim with respect to the 2013 non-promotion that is at issue here. *See Sierra*, 254 F. Supp. 3d 244 n.11. Accordingly, Defendant could have brought the present Rule 12(b)(6) motion as part of the earlier motion to dismiss. None of the Rule 12(h) exceptions apply, moreover, because Defendant does not contest subject matter jurisdiction, the pleadings have not yet closed, and the case is not at the trial stage. *See* Fed. R. Civ. P. 12(h)(2)–(3). In the instant case, then, Rule 12 might seem to disallow a second 12(b)(6) motion.

However, "in a limited number of cases[,] the district court has exercised its discretion to permit a second preliminary motion to present a Rule 12(b)(6) defense." *Lindsey v. United States*, 448 F. Supp. 2d 37, 55 (D.D.C. 2006) (quoting *Stoffels ex rel. SBC Concession Plan v. SBC Commc'n, Inc.*, 430 F. Supp. 2d 642, 647 (W.D. Tex. 2006)). A court is most likely to permit a second such motion if "the problem [Rule] 12(g) was designed to prevent—unnecessary delay—[is] not a concern." *Id.* (alteration in original) (quoting *Stoffels*, 430 F. Supp. 2d at 648 (internal citation omitted)); *see also Campbell–El v. District of Columbia*, 881 F. Supp. 42, 43 (D.D.C. 1995) (entertaining renewed 12(b)(6) motion "in order to avoid undue delay" and noting that Defendants were not "repeating arguments on which the Court ha[d] already substantively ruled"); *Donnelli v. Peters Sec. Co.*, No. 02 C 0691, 2002 WL 2003217, at *4 (N.D. Ill. Aug. 29, 2002) (permitting second Rule 12(b)(6) motion where "defendants' motion was not filed for the purpose of delay and . . . adjudication of the instant motion w[ould] narrow the scope of th[e] matter, greatly expediting resolution of the case").

Here, unnecessary delay is not a concern because the parties have articulated their arguments regarding the 2013 non-promotion claim and the Court has not already ruled on this issue.  In fact, this Court expressly *declined* to rule on this issue in its 2017 Opinion.  *See Sierra*, 254 F. Supp. 3d at 245.  Moreover, the second motion to dismiss is being considered simultaneously to the post-discovery motion for summary judgment.  As such, there is no delay that has resulted from *seriatim* motions to dismiss delaying the commencement of discovery.  And if anything, a failure to consider the instant motion could *cause* delay because a strict construal of Rule 12 could still permit Defendant to file an answer, such that the pleadings would be formally closed, and then file a new motion for judgment on the pleadings under Rule 12(c).  Furthermore, this Court's adjudication of the 12(b)(6) motion to dismiss Plaintiff's claim will efficiently resolve the non-promotion issues pending in this case, regardless of the fact that an answer has, apparently, inadvertently never been filed.  Accordingly, particularly because Plaintiff adopts the Rule 12(b)(6) language in its own opposition and has not raised any Rule 12(g) objection, this Court will treat Defendant's Rule 12 Motion as a Rule 12(b)(6) Motion to Dismiss.

### 2.  Motion to Dismiss

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint's factual allegations are to be taken as true, and the court is to construe them liberally in the plaintiff's favor.  *See, e.g.*, *United*

*States v. Philip Morris*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Notwithstanding this liberal construal, the court deciding a Rule 12 motion must parse the complaint for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility requirement means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). A plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

The court ruling on a Rule 12(b)(6) motion to dismiss "may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by [the parties]." *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133–34 (D.D.C. 2013) (alteration in original) (internal citations and quotations omitted); *see also Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (citations omitted); *Vila v. Inter–Am. Inv., Corp.*, 536 F. Supp. 2d 41, 46 n.5 (D.D.C. 2008) (citation omitted). The court may also take "judicial notice of facts on the public record . . . when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim to relief upon which relief could be granted." *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1228 (D.C. Cir. 1993)).

## B. Motion for Summary Judgment

Defendant also moves for summary judgment on Plaintiff's hostile work environment claims. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## V. ANALYSIS

As a threshold matter, the Court will clarify which of Plaintiff's factual allegations and associated evidence it considers in assessing her claims. Plaintiff's original complaint included a

discriminatory non-promotion claim, Compl. ¶ 41, a retaliatory non-promotion claim covering 2014 to 2016, *id.* at ¶¶ 43–44, and a hostile work environment claim asserting that "Ms. Sierra has been subjected to unwelcome harassment" based on race, sex, and nationality," *id.* at 33. As discussed previously, this Court granted in part Defendant's first 12(b)(6) motion and dismissed the claims "related to the allegedly discriminatory and retaliatory non-promotions that occurred from 2008 to 2012 and from 2014 to 2016," *Sierra*, 254 F. Supp. 3d at 233, while reserving judgment on Plaintiff's 2013 non-promotion claim, *see id.* at 245. It is thus clear that the 2008 to 2012 and 2014 to 2016 failure to promote claims are non-actionable as discrete discriminatory acts. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The question is whether the non-promotion claims, even if not individually actionable, may enter the Court's hostile work environment analysis.

A footnote in Plaintiff's opposition argues that the answer is yes: Plaintiff links the non-promotion and hostile work environment theories of relief, asserting that "[t]he failure to promote claims from 2008 to 2013 are still a part of the hostile work environment claim, even if not discrete acts standing alone." Pl.'s Opp'n 33 n.20. Defendant's reply does not address this point. Given Defendant's failure to address this issue, this Court considers Plaintiff's non-promotion claims from 2008 to 2013 as evidence in support of her hostile work environment claim, regardless of the merits of Plaintiff's non-promotion claims as individual claims for relief.[6]

---

[6] Because Plaintiff does not at any point argue that the 2014 to 2016 retaliatory failure to promote allegations should be considered in the context of her hostile work environment claim, the Court will not address whether Plaintiff might have raised a *retaliatory* hostile work environment theory of relief. The Court considers only the 2008 to 2013 *discriminatory* failure to promote allegations.

"[T]he D.C. Circuit has made clear that the same acts may 'simultaneously support different types of Title VII claims' since 'plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct.'" *Peters v. District of Columbia.*, 873 F. Supp. 2d 158, 195 (D.D.C. 2012) (citing *Baird v. Gotbaum* (*Baird I*), 662 F.3d 1246, 1252 (D.C. Cir. 2011). A distinct legal standard applies to each theory of relief. In deciding a hostile work environment claim, a court's "task is to determine whether the acts about which [the plaintiff] complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Singletary v. D.C.*, 351 F.3d 519, 528 (D.C. Cir. 2003) (quoting *Morgan*, 536 U.S. at 120). The Supreme Court recently clarified that Title VII's charge-filing requirement is *not* a jurisdictional requirement, but rather stands as a mandatory claim-processing rule. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848–52 (2019). A court must enforce a claim processing rule "if a party 'properly raises it.'" *Id.* at 1849 (quoting *Eberhart v. United States*, 546 U.S. 12, 15, 19 (2005) (per curium)). But an objection based on a mandatory claim-processing rule may be forfeited" if not timely raised. *Id.* (quoting *Eberhart*, 546 U.S. at 15).

Here, Defendant has not argued in either of its motions to dismiss the non-promotion claims or in its motion for summary judgment on the hostile work environment claim that Plaintiff failed to timely file an administrative complaint associated with her discriminatory hostile work environment theory of relief. Nor does Defendant argue that Ms. Sierra's discriminatory non-promotion claims are analytically distinct from her hostile work environment claim. Accordingly, the Court accepts as undisputed that Plaintiff's non-promotion allegations form part of the same chain of events as the rest of her discriminatory hostile work environment claim and considers Ms. Sierra's 2008 to 2013 failure to promote allegations as one piece of

relevant evidence in assessing Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.  Parsing the evidence before it in this way, for the reasons laid forth below, the Court will grant Defendant's motion to dismiss Plaintiff's 2013 failure to promote claim and deny in part Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

### A.  2013 Non-Promotion

Even construing the pleadings in the light most favorable to Plaintiff, as it must, the Court concludes that Ms. Sierra has not established a plausible discriminatory or retaliatory non-promotion claim for the year 2013.  As discussed in this Court's June 2017 memorandum opinion, to establish a prima facie non-promotion claim in a case involving denial of a grade or salary promotion, a plaintiff "must show that (1) [s]he sought and was denied a promotion (2) for which [s]he was qualified, and (3) that other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied."  *See Sierra*, 254 F. Supp. 3d at 244–25 (alterations and omission in original) (quoting *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 120 (D.D.C. 2014) (internal alterations and quotation marks omitted)); *see also Taylor v. Small*, 350 F.3d 1286, 1294 (D.C. Cir. 2003), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016); *Cones v. Shalala*, 199 F.3d 512, 517 (D.C. Cir. 2000).  Although a plaintiff need not plead all the elements of a prima facie case to survive a 12(b)(6) motion to dismiss, *see Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)), she must still plead factual allegations that suffice to make out a plausible claim for relief.

Here, Plaintiff's factual allegations do not sustain a plausible retaliatory or discriminatory non-promotion theory of relief for the year 2013.  Ms. Sierra has not established that she sought

out an increase in salary or grade in the year 2013.  To be sure, Ms. Sierra contends that she did

in fact seek a promotion from the GS-13 to the GS-14 level in 2013 because she "discussed the

prospect of promotion regularly" with her supervisor and has "sought a career ladder promotion

since 2008."  Pl.'s Opp'n 29–30.  She argues that she expected a promotion because "[i]t was

explained to [her], and [she] believed based upon observing practice within the Library, that she

would be promoted to the GS-14 level within two years of the commencement of her position of

Management Analyst."  Compl. ¶ 17.  Plaintiff thus appears to urge the Court to connect the

dots: if her understanding of LOC practices led her to expect a promotion within two years of

being hired in 2007, yet she was not promoted by 2009 and still had not been promoted as of

2013, then of course she must have sought a promotion in 2013.  But this inference does not

support Ms. Sierra's complaint as a *legal matter*.  A court "need not accept inferences . . . if such

inferences are unsupported by the facts set out in the complaint."  *Kowal v. MCI Commc'ns

Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Here, Plaintiff fails to present any factual allegations to support the premise that she

formally sought a promotion in the year 2013.  Nothing in Plaintiff's original complaint or

subsequent pleadings, including Plaintiff's opposition to Defendant's motion to dismiss her 2013

non-promotion claim, establishes that Ms. Sierra specifically "sought and was denied a

promotion" in 2013.  *Nurriddin*, 40 F. Supp. 3d at 120 (quoting *Taylor*, 350 F.3d at 1294); *see

also Bundy*, 641 F.2d at 953.  Plaintiff thus cannot plausibly establish the first element required

to make out a non-promotion claim in a case involving denial of a grade or salary promotion.

Furthermore, Ms. Sierra does not plead facts that plausibly indicate that "other employees

of similar qualifications . . . were indeed promoted at the time the plaintiff's request for

promotion was denied."  *Nurriddin*, 40 F. Supp. 3d at 120 (omission in original) (quoting *Taylor*,

350 F.3d at 1294).  Plaintiff has not alleged that any other promotions were made in Ms. Sierra's department in the year 2013.  In fact, according to Defendant, "[LOC] records show that no one else was promoted in the SPO office during the entire time Karen Lloyd was the supervisor." Def.'s Mot. 5–6.  Plaintiff offers no contrary factual allegations that indicate that there were *any promotions* during her tenure in the SPO office.  In short, even construed in the light most favorable to Ms. Sierra, none of Plaintiff's factual allegations suggest either that she sought a promotion in the year 2013 or that others were promoted in that year.  As such, she cannot state a non-promotion claim for relief that is plausible on its face, *see Iqbal*, 556 U.S. at 678, and the Court will thus grant Defendant's motion to dismiss Plaintiff's 2013 non-promotion claim.

## B.  Discriminatory Hostile Work Environment

In addition to her failure to promote claims, Plaintiff's discriminatory hostile work environment claim seeks relief for her "supervisor's demonstrable bias and hostility toward her." Compl. ¶ 1.  Plaintiff specifically contends that she was subjected to severe and persistent harassment by her supervisor, Ms. Lloyd, because of her race (Hispanic), national origin (Colombian), and/or sex (female), creating a hostile work environment that unreasonably interfered with her job performance.  *Id.* ¶¶ 33–34.  Defendant argues that this hostile work environment claim fails because Plaintiff neglects to provide adequate non-conclusory evidence to sustain her allegations and because the incidents that she identifies do not rise to a legally actionable level.  Def.'s Mot. 8–9.  Defendant makes two arguments.  *Id.*  First, Defendant asserts that the claims "warrant summary judgment because they fall far short of the 'severe or pervasive' showing that courts in this Circuit require."  *Id.* at 6.  Second, Defendant contends that Ms. Sierra cannot establish the requisite "linkage between the hostile behavior and the plaintiff's membership in a protected class" for any of her claims based on race, national origin, or sex.  *Id.*

at 8 (quoting *Román v. Castro*, 149 F. Supp. 3d 157, 170 (D.D.C. 2016)); *see also* Def.'s Reply 4 ("Plaintiff's [a]lleged [a]cts [s]upporting the [h]ostile [w]ork [e]nvironment [c]laim [l]ack [a]ny [c]onnection to [h]er [s]ex, [r]ace, or [n]ational origin.").[7]  As detailed below, the Court lands between the parties' positions.  The Court concludes that Plaintiff has established that there are genuine issues of material fact regarding both the severity or pervasiveness of the alleged conduct and the linkage between the alleged conduct and her membership in a protected class for Plaintiff's claims of race/national origin discrimination, and it will deny Defendant's motion for summary judgment on that basis.  It further finds, however, that Ms. Sierra has not alleged facts that would permit a reasonable juror to conclude that the conduct at issue was because of her status as a woman.  Thus, there are no genuine disputes of material fact for this aspect of Plaintiff's claim, and the Court will grant Defendant's motion for summary judgment with regard to Plaintiff's sex-based discriminatory hostile work environment claim.

### 1. Hostile Work Environment Legal Standard

Title VII protects employees against hostile and abusive working environments.  "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[7] Defendant's motion for summary judgment centers on severity or pervasiveness, whereas its reply emphasizes the lack of requisite linkage between Plaintiff's allegations and her membership in a protected class.  Plaintiff's opposition does not explicitly engage with this argument, instead focusing on what Plaintiff asserts are material facts in dispute.  *See, e.g.*, Pl.'s Opp'n 44.  Although this Court will not consider arguments raised for the first time in reply, *see In re Asemani*, 455 F.3d at 300 (citation omitted), Defendant's original motion for summary judgment specifically alleges that Plaintiff cannot prove the required "linkage" between the alleged conduct and her "membership in a protected class," Def.'s Mot. 8 (quoting *Román*, 149 F. Supp. 3d at 170); *see also id.* at 11 ("Sierra's perception that she was being selectively criticized because of her national origin, race, or sex finds no support in the record.").  Thus, the issue of causation is not raised for the first time in reply, and the Court considers both of Defendant's arguments.

abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). Yet Title VII's protections do not set out a "general civility code for the American workplace." *Casey v. Mabus*, 878 F. Supp. 2d 175, 189 (D.D.C. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Even if a plaintiff alleges a stressful or harsh work environment, not every such workplace is "discriminatorily abusive" such that it is actionable under Title VII. *Harris*, 510 U.S. at 22; *see also Tucker v. Johnson*, 211 F. Supp. 3d 95, 101 (D.D.C. 2016) (discussing Title VII's "demanding legal standard" (quoting *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77 n.20 (D.D.C. 2013))).

To make out a hostile work environment claim for relief, the allegedly discriminatory conduct must not only be subjectively perceived as abusive, but also be so "severe or pervasive" that it "create[s] an objectively hostile or abusive work environment." *Casey*, 878 F. Supp. 2d at 188 (quoting *Harris*, 510 U.S. at 21). There is no "mathematically precise test," *Harris*, 510 U.S. at 22, for what makes a workplace "so objectively offensive as to alter the 'conditions' of the victim's employment," *Oncale*, 523 U.S. at 81. To determine whether the allegedly discriminatory conduct rises to this level, a court is to analyze the totality of the circumstances. In assessing the totality of the circumstances, a court must "consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002) (citing *Harris*, 510 U.S. at 21–23); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). This Circuit has emphasized that "[t]he test set forth by the Supreme Court is whether the alleged conduct is 'sufficiently severe *or* pervasive'—written in the disjunctive—not whether the conduct is 'sufficiently

severe *and* pervasive.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *see also Baloch*, 550 F.3d at 1201 (disaggregating "severe" and "pervasive" analysis).

In addition, to successfully make out a hostile work environment claim, a plaintiff must show that the alleged "harassment occurred because of the plaintiff's protected status." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012) (citation omitted); *see also Dorns v. Geithner*, 692 F. Supp. 2d 119, 135–36 (D.D.C. 2010) (internal citations omitted). Critically, there must be a "'linkage between the hostile behavior and the plaintiff's membership in a protected class' for a hostile work environment claim to proceed." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) (quoting *Na'im v. Clinton,* 626 F. Supp. 2d 63, 73 (D.D.C. 2009)); *see also Baloch*, 550 F.3d at 1201. The same totality of the circumstances analysis applies in assessing whether there is such a linkage. *See Baloch*, 550 F.3d at 1201.

## 2. Severity or Pervasiveness of Alleged Conduct

In assessing whether the conduct at issue here is so severe or pervasive that it creates an objectively hostile work environment, the Court bears two competing principles in mind. First, the Court must be certain to assess the facts before it in toto. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 568 (D.C. Cir. 2019) ("A district court errs in 'reviewing each racially charged remark individually and finding it insufficient' rather than considering the statements 'alongside any additional statements—and all other evidence.'" (quoting *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016))). Second, at the same time that it reviews the alleged facts in the aggregate, the Court must take care to consider whether the alleged conduct has the requisite heft to be actionable—or whether it amounts to a series of "slights" that are "no more a

hostile work environment than a pile of feathers is a crushing weight." *Baird v. Gotbaum* (*Baird II*), 792 F.3d 166, 171–72 (D.C. Cir. 2015).

Here, Defendant paints Plaintiff's account as a series of events that are not severe or pervasive enough to be actionable, whether considered individually or collectively. Def.'s Mot. 9. Defendant characterizes the alleged incidents as "a handful of events and comments that occurred over the course of more than four years" and are disconnected from Plaintiff's national origin, race, or sex, such that summary judgment is warranted. *Id.* at 21–22. The Court agrees with Defendant that, if Ms. Lloyd's acts are taken individually, then none of the alleged actions that Ms. Sierra describes are of the sort deemed *severe* enough to make out a hostile work environment claim for relief. There is no single event that meets the high threshold—such as the use of a universally offensive racial epithet—that suggests an objectively hostile or abusive work environment. *Compare Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014) (outbursts and "tactless and ill-mannered" supervisors and coworkers do not establish hostile work environment), *with Ayissi-Etoh*, 712 F.3d at 577 (suggesting that reasonable factfinder might be able to conclude that use of extremely offensive racial epithet while yelling at employee was sufficiently severe or pervasive to create hostile work environment). But conduct can be actionable if it is severe *or* pervasive. *See Ayissi-Etoh*, 712 F.3d at 579 (Kavanaugh, J., concurring). And as set forth below, the Court finds that a reasonable jury could conclude that Plaintiff's supervisor's conduct, assessed in its totality, was *pervasive* in a way that created a discriminatory hostile work environment.

Considering, first, the frequency of the alleged incidents, it is not clear as a matter of law that they were too diffuse to qualify as actionable. Ms. Sierra's complaint includes a period that runs from 2008 to 2016, yet focuses on events from 2009 to 2013. Defendant also homes in on

this four-year period in its motion for summary judgment. *See* Def.'s Mot. 9 (referring to "a series of events that occurred from 2009-2013"). Within this window, Ms. Sierra's filings canvass a significant number of incidents.

For one, Plaintiff alleges that Ms. Lloyd repeatedly "moved the goal posts" for success in her position, Pl.'s Opp'n 2, by adding new requirements during each of the evaluation periods in 2009 (take the ICP out of the library), 2010 (acquire supervisory experience), and 2011 (improve writing), respectively, *see id.* at 4, 11–12. She further points to incidents at the monthly ICP meetings wherein Ms. Lloyd interrupted Ms. Sierra and "would literally 'interpret' what Ms. Sierra was saying," Pl.'s Opp'n 37, in a fashion that Ms. Sierra's coworkers have characterized as "blatantly racist," *id.* (quoting Claypoole Aff. Addendum 4). Plaintiff states that these interruptions occurred "[d]uring multiple *monthly* Internal Control Program meetings" and identifies the specific dates of four such interruptions between 2010 and 2012. *Id.* at 37 & n.22 (emphasis added). Ms. Sierra avers that "Ms. Lloyd *frequently* ordered Ms. Sierra to repeat her statements" and "looked at Ms. Sierra during her presentations with disdain." *Id.* at 37. She also provides a different coworker's statement that, during staff meetings, Ms. Lloyd would "ask Ms. Sierra to restate something" in a manner that the coworker found unnecessary "because [Ms. Sierra] had described it sufficiently the first time." Morse Dep. 53:14–55:4.

Above and beyond these incidents, and in addition to the specific 2009 rehearsal at which Ms. Lloyd allegedly mocked Ms. Sierra's accent and compared her speech to a "wah wah wah" sound, Plaintiff describes a number of other problematic interactions with Ms. Lloyd. Her allegations include Ms. Lloyd's restriction of her direct communications with Mr. Page beginning in March 2010, *see* Pl.'s Opp'n 39, criticism of Ms. Sierra for volunteering for a teleconference for preservation by the American Embassy in Mexico held in 2010, *id.* at 40

(citing Page Aff. 2), and calling Plaintiff a "traitor" as well as forbidding her to give her name to her "friends" for any similar projects, *id.* The next year, in 2011, Ms. Lloyd allegedly called Ms. Sierra a "betrayer" for a conversation with Mr. Page. *Id.* In this same conversation, Ms. Sierra states that Ms. Lloyd invoked her matriarchy in a manner that was extremely disrespectful of her culture. *Id.* Plaintiff further points to Ms. Lloyd's restriction of her ability to participate in the LOC's 2013 "Celebration of Mexico" event as evidence of the way in which "Ms. Lloyd seemed to specifically disdain when Ms. Sierra would participate in events involving other Latin American countries." *Id.* Moreover, Plaintiff suggests that Ms. Lloyd humiliated her in public on multiple occasions, such as by comparing her outfit to carpet that "nobody liked," Sierra Dep. 78:11, and by forbidding her to use the common restroom at a work event in 2011, Sierra Dep. 82:18–25 to 83:1–8. This last allegation, to have one's bathroom use restricted like a child before one's colleagues, could be considered public humiliation by any reasonable juror.

In this Circuit, allegedly discriminatory conduct has been found non-actionable in cases that, like this one, spanned four to five years. For instance, in *Brooks v. Grundmann*, the D.C. Circuit found that the identified conduct essentially amounted to isolated "expression[s] of frustration" over several years. 748 F.3d at 1277. And several district courts in this Circuit have followed a hard line and found conduct non-actionable when it did not occur with great frequency. *See, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009) (finding no hostile work environment where, over an approximately four-year period, plaintiff was subjected to "disparaging remarks, criticisms of his work, and other negative comments" as well as "removal of important assignments, lowered performance evaluations, and close scrutiny of assignments"); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–99 (D.D.C. 2007) (finding no hostile work environment despite five distinct instances of sexual harassment by

coworkers over eighteen months). *But see Richardson v. Petasis*, 160 F. Supp. 3d 88, 126–27 (D.D.C. 2015) (denying motion for summary judgment when employer made physical threats of violence, removed supervisory duties, reassigned plaintiff, and took disciplinary actions within the span of several months).

Critically, the Supreme Court in *Harris* did not set out a mathematical test for what amounts to pervasively abusive conduct. *See* 510 U.S. at 22; *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th. Cir. 2005) (rejecting district court's characterization of conduct as "a handful" of "isolated, sporadic incidents" that occurred "over a five year period" in the face of testimony that the alleged acts "were like everyday jokes" that occurred "so many different times" (internal quotation marks omitted)); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) ("[T]here is neither a magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."). What matters is the totality of the circumstances. And here, the Court finds that Plaintiff has offered specific evidence that she was subjected to ongoing incidents that occurred "*frequently*," Pl.'s Opp'n 37, and perhaps as often as every month at ICP meetings between 2010 and 2012. Thus, the Court is unable to say that these acts were so diffuse as to be non-actionable as a matter of law.

Moreover, Ms. Lloyd's purported pattern of behavior is distinct from the kinds of "ordinary tribulations of the workplace," *Brooks,* 748 F.3d at 1277–78 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), that "are not actionable under Title VII," *id.* at 1278. Pairing the allegations regarding Ms. Sierra's accent and participation in Latin American events with the allegations regarding Ms. Lloyd's publicly humiliating comments and repeated denial of workplace opportunities, such as the approval of a detail and the fact that she was not promoted

despite apparently meeting the goals set out for her, a reasonable juror could conclude that the alleged conduct amounts to more than dismissible "slights."

To assess the totality of the circumstances, the Court cannot single out just one aspect of this evidence. This is not a case that alleges *only* that a supervisor criticized and was rude to an employee, such that the court found the conduct "insufficient as a matter of law for a hostile work environment case." *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 54–56 (D.D.C. 2004) (granting motion for summary judgment on hostile work environment claim where supervisor purportedly overlooked employee, spoke to her in a hostile and patronizing manner, shut her out of meetings, and denied travel opportunities); *see also Brooks*, 748 F.3d (granting motion for summary judgment on hostile work environment claim where plaintiff was subjected to criticism and in which voices were raised in meetings two-and-a-half years apart). Nor is it a case that centers *only* on supervisory choices such as "the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management," which other courts in this circuit have concluded cannot "be characterized as sufficiently intimidating or offensive in an ordinary workplace context[]" to be actionable. *Nurriddin*, 674 F. Supp. 2d at 94 (citing *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005)). Nor is it a case that alleges only stress and tension with a supervisor, and as such falls short of Title VII's legal standard. *See, e.g.*, *Cooper v. Nielsen*, No. CV 17-10 (ABJ), 2019 WL 1254933, at *7 (D.D.C. Mar. 19, 2019) (concluding that "stress" and "confusion" as well as feeling "always on guard," "demeaned," "excluded," "harassed and badgered" were "subjective feelings [that] are not enough to defeat summary judgment").

Rather, the facts offered to the Court combine many of the factors that individually might not cross the pervasiveness threshold. But this Court will not focus so closely on individual

aspects of the complaint that it becomes myopic about the bigger picture. Here, taking all facts in favor of Plaintiff—as the Court must—the combination of alleged incidents over time, coupled with evidence that Plaintiff was not permitted to go on a detail or promoted over seven years despite meeting specified performance goals, and adding in a number of incidents involving public humiliation, could lead a reasonable juror to find the alleged conduct so pervasive that it altered the conditions of Ms. Sierra's employment and created an abusive work environment. *Cf. Singletary*, 351 F.3d at 526–28 (declining to grant summary judgment and finding genuine dispute of material fact as to severity or pervasiveness where employer failed to give employee a formal job description for six years, which meant that he was denied promotion opportunities, and also forced him to work in an unventilated storage room for a year and a half). Where such a genuine dispute of material fact exists, summary judgment is not warranted. Thus, the Court cannot grant Defendant's motion for summary judgment on the basis that the alleged work hostility was insufficiently severe or pervasive.

### 3. Linkage between Alleged Conduct and Protected Attributes

Having found that there is a question of fact concerning whether the work hostility that Plaintiff experienced was sufficiently severe or pervasive, the Court must turn to Defendant's argument that summary judgment is warranted because there is not the requisite linkage between Ms. Lloyd's alleged conduct and Ms. Sierra's membership in a protected class. *See* Def.'s Mot. 8; Def.'s Reply 4–8. Defendant initially discounts Ms. Lloyd's alleged conduct based on the "same actor inference:" because Ms. Lloyd hired Ms. Sierra, it is "probative evidence" that she did not discriminate against Plaintiff. Def.'s Mot. 9 (quoting *Vatel v. All of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)). Defendant contends that, in any event, there simply is no connection between the alleged conduct and Ms. Sierra's race, national origin, or sex. *Id.* at 11.

Plaintiff's opposition counters by pointing to specific evidence that Ms. Sierra contends leave "material facts in dispute." Pl.'s Opp'n 1, 44–45. For the reasons detailed below, the Court agrees with Plaintiff that—notwithstanding the "same actor inference"—the evidence in the record leaves genuine disputes of material fact regarding the connection between the alleged conduct and Ms. Sierra's race/national origin, and thus will deny summary judgment on this basis. But the Court finds that Plaintiff has not established an adequate linkage between the alleged conduct and her sex, such that no reasonable juror could find in her favor on this aspect of her claim. Thus, the Court will grant in part Defendant's motion for summary judgment regarding Ms. Sierra's sex-based hostile work environment claim.

### a. Race and National Origin[8]

Defendant asserts that Ms. Sierra has failed to establish the requisite linkage between Ms. Lloyd's alleged discrimination and her status as a Colombian, Hispanic individual. *See* Def.'s Mot. 11. Defendant emphasizes, in particular, Plaintiff's own admission that there was no direct connection between Ms. Lloyd's comments or conduct and Ms. Sierra's accent. *Id.* (citing Sierra Dep. 151:15–20). Unsurprisingly, Plaintiff construes the facts differently and argues that "the uncontroverted facts presented by Plaintiff prove that Plaintiff's direct supervisor," Ms. Lloyd, "made multiple discriminatory comments to Ms. Sierra based on Ms. Sierra's national origin[] [and] race." Pl.'s Opp'n 2. Ms. Sierra's argument also emphasizes the way in which Ms. Lloyd "routinely ridiculed Plaintiff for her accent." *Id.* Because both parties foreground the allegations regarding Plaintiff's accent, the Court begins its analysis there.

---

[8] The parties do not distinguish between Plaintiff's nationality (Colombian) and race (Hispanic). This is not a case in which such a distinction is important (*e.g.*, a Colombian plaintiff alleges that her Venezuelan supervisor subjected her to a hostile work environment, or favored her Panamanian coworkers). Accordingly, this Court will consider Plaintiff's race and national origin claims jointly.

The allegations regarding Ms. Sierra's accent are essential in evaluating the claim that Plaintiff was subjected to national origin discrimination. As the D.C. Circuit has made clear, "a foreign accent and national origin are often intertwined, and courts can look to evidence of discrimination on the basis of one's accent in support of a claim of national origin discrimination." *Iyoha*, 927 F.3d at 567 (citing *In re Rodriguez*, 487 F.3d 1001, 1008–10 (6th Cir. 2007); *Fragante v. City & Cty. of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989)). Moreover, mockery of an employee's name and accent can permit a jury to infer national origin discrimination, even where there is no "direct connection" between the disparaging comments and the alleged discrimination.[9] *Mayorga v. Merdon*, 928 F.3d 85, 94 (D.C. Cir. 2019). Accordingly, a court assessing allegations of a hostile work environment must not conclude its analysis simply because there is no explicit connection between comments about an employee's accent and other specific acts comprising the hostile work environment. The Court has already determined that Ms. Lloyd subjected Plaintiff to a work environment that a reasonable juror could find to be pervasively hostile. The next question becomes, "why?" Any evidence that sheds light on that question must be considered. Mockery of one's accent certainly qualifies.

Here, Ms. Sierra describes a single incident during which Ms. Lloyd allegedly mocked her accent and suggests that this incident was part of a pattern of discriminatory behavior. Plaintiff avers that, during her September 15, 2009, presentation rehearsal, Ms. Lloyd interrupted her repeatedly, called her presentation "incoherent," and mockingly said, "you're talking like wa wa wa" with a look of "disgust." Pl.'s Opp'n 7. Ms. Sierra proffers corroboration from a coworker, Ms. Hernandez, who states that Ms. Lloyd "harshly criticized" and "aggressively

---

[9] Although *Mayorga* involved a non-promotion claim, not a hostile work environment claim, this analytic point holds: mockery of an accent is to be considered alongside other evidence of national origin discrimination to determine whether a plaintiff has met her burden.

harassed" Ms. Sierra "by interrupting and bombarding Plaintiff with criticism while she was practicing." *Id.* at 8 (quoting Hernandez Aff. 3). In addition, Plaintiff details other meetings at which Ms. Lloyd repeatedly interrupted her and asked others in the room if they understood what Ms. Sierra was saying in a way that suggested she needed "an interpreter." *Id.* at 17–18. Coworkers again sustain this account, with one coworker, Ms. Claypoole, characterizing Ms. Lloyd's interruptions as "blatantly racist." *Id.* at 37 (quoting Claypoole Aff. 4). Moreover, Ms. Lloyd's own supervisor confirmed that Ms. Lloyd treated Plaintiff worse than other employees under her supervision. *See* Page Aff. 3. And there is no indication that any of these other employees are from Latin America.

Taking these allegations to be true, as it must, the Court finds that a reasonable juror could find Ms. Lloyd's conduct regarding Ms. Sierra's accent to be evidence of national origin or race-based discrimination. Unlike suits in which courts in this circuit have granted summary judgment, this is not a case in which Plaintiff bases her claims of discrimination "on her own conclusory allegations." *Douglas-Slade*, 793 F. Supp. 2d at 101; *see also Dawson v. Reukauf*, 751 F. Supp. 2d 146, 151 (D.D.C. 2010) ("[Plaintiff] has not alleged that any of her supervisors . . . subjected her to derogatory insults because of her race. . . . Plaintiff merely asserts, based solely upon her own statements, that she was subjected to frequent harassment and hostile actions." (internal quotation marks omitted)). In this case, Plaintiff offers specific evidence that connects Ms. Lloyd's responses to her accent with her claim of race/national original discrimination.

Moreover, the Court rejects Defendant's argument that summary judgment is warranted because Ms. Lloyd never "said anything derogatory about Plaintiff's national origin[] [or] race." Def.'s Reply 4–5. As stated previously, the *Mayorga* court emphasized that discrimination can

exist even where there is not a "direct connection" between disparaging comments and the alleged discrimination. *See* 928 F.3d at 94. In determining the cause for Ms. Lloyd's hostility towards Plaintiff, the Court must look at all evidence that sheds light on her motivations. These incidents clearly do. With these principles in mind, and assessing the situation in its totality, *see Iyoha*, 927 F.3d at 568, this Court cannot conclude that the alleged incidents have no relationship to Plaintiff's membership in a protected class, as a matter of law. Ms. Sierra points to specific, corroborated evidence that Ms. Lloyd mocked her accent and thought she required interpretation. The presence of particularized evidence of this sort makes this case a far cry from those in which other courts in this Circuit have found no connection between the allegedly offensive comments and the protected class at hand. *See, e.g.*, *Kline v. Springer*, 602 F. Supp. 2d 234, 243 (D.D.C. 2009) (finding plaintiff had not provided record evidence to support hostile work environment claims where "[n]one 'of the comments or actions directed at [the plaintiff] expressly focused on [her] race.'" (second and third alterations in original) (quoting *Baloch,* 550 F.3d at 1201)), *aff'd sub nom. Kline v. Berry*, 404 F. App'x 505 (D.C. Cir. 2010); *Stewart v. Evans*, 275 F.3d 1126, 1129, 1131–33 (D.C. Cir. 2002) (affirming dismissal of sex discrimination-based hostile work environment claim that centered on single phone call in which individual used offensive profanities that were not explicitly connected to plaintiff's sex). In the instant case, a reasonable juror could conclude that the alleged incidents demonstrate a pattern of hostility towards Ms. Sierra's language/accent that a reasonable juror could consider evidence of national origin and/or race-based discrimination. Accordingly, the Court cannot conclude, as a matter of law, that the requisite linkage between Ms. Lloyd's conduct and Ms. Sierra's race and/or nationality does not

exist here.[10]  The Court thus denies Defendant's motion for summary judgment on Plaintiff's

claim that she was subjected to  a hostile work environment based on her national origin and/or

race.

*b. Sex*[11]

The final issue facing the Court is whether Plaintiff has established the requisite link

between Ms. Lloyd's alleged conduct and Ms. Sierra's sex.  For the following reasons, the Court

finds that a reasonable juror could not conclude that the alleged discriminatory treatment was

*because of* her status as a woman.

The majority of Ms. Sierra's factual allegations focus on race and/or national origin

discrimination, not sex.  The sole factual allegation regarding sex-based discrimination that

Plaintiff proffers is a single incident wherein Ms. Lloyd "arbitrarily changed" Ms. Sierra's May

23, 2011, meeting to an earlier time in order to accommodate a white, male employee.  Pl's

Opp'n 42.  Plaintiff's only other sex-specific discussion comes in the form of third-party

statements, including, most notably, Mr. Page's affidavit statement that "Ms. Lloyd was often

more critical of the [Plaintiff] . . . and [male employees] generally seemed to be treated with

more respect than the women who were supervised by Ms. Lloyd."  Page Aff. 3.

But even crediting this statement, such corroboration is not the same as specific facts.  To

survive a motion for summary judgment, a plaintiff must point to "specific facts showing that

there is a genuine issue for trial."  *Celotex*, 477 U.S. at 323.  And here, Ms. Sierra fails to provide

---

[10] Because it reaches this conclusion based on the alleged accent-related comments alone, the Court need not parse Ms. Sierra's other allegations regarding writing classes or attendance of Latin American events, which reinforce this same conclusion.

[11] Both parties' arguments regarding sex-based discrimination are, in a word, conclusory, and the Court addresses them despite the fact that many of the contentions on both sides lump sex in alongside race and national origin, without offering any further specificity or argumentation about alleged sex discrimination.

the requisite specific facts to rebut Defendant's contention that there is no connection between her sex and Ms. Lloyd's alleged acts. *See* Def.'s Reply 4–8. Other than the meeting incident, Plaintiff does not point to any specific facts at all that link Ms. Lloyd's alleged conduct to Plaintiff's status as a woman. To be sure, Plaintiff does state that there was favoritism toward "the two white males" in the office, Pl.'s Opp'n 42, and notes that another "minority (non-white) female[]" also alleged that Ms. Lloyd created a hostile work environment, *id.* at 20. But Ms. Sierra does herself a disservice by alleging race/nationality and sex-based allegations in the same clause. Without more that links the conduct to sex, in more specific terms, there is not non-conclusory backing to permit the inference that the conduct at issue was *because of* sex. Even in deciding a motion for summary judgment, the Court need not accept conclusory inferences as true. *See Greene*, 164 F.3d at 675 ("Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." (citations omitted)). Thus, Plaintiff's evidentiary showing is insufficient to establish specific facts in support of her claim.

Moreover, Plaintiff has failed to specify which facts are in dispute in a manner that creates a genuine issue for trial. There is a genuine issue for trial when a rational juror could find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968))). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (quoting Fed. Rule Civ. Proc. 56(a)).

In this case, although Plaintiff asserts in broad strokes that there are disagreements with the Defendant about key facts, such that summary judgment is inapposite, *see* Pl.'s Opp'n 35–36, she does not present any particular disputes that involve alleged sex discrimination. As such, she has not established any genuine dispute regarding the facts in the record. It is therefore noteworthy that other parts of the record, like the fact that Ms. Lloyd did approve a detail for another female supervisee, *see* Lloyd Dep. 91:4–92:11, and the fact that at least one female employee was allowed to contact Mr. Page directly, *see* Sierra Dep. 142:23–143:1, can be read to undercut the claim that Ms. Lloyd discriminated in a way that created a hostile work environment on the basis of sex. *See* Def.'s Reply at 6–7 (arguing that Ms. Lloyd's conduct was "neutral with respect to Plaintiff's status as a woman."). The existence of these facts, along with—as discussed above—Plaintiff's own failure to point to specific facts that link up the alleged conduct with her status as a woman, amount to a lack of evidence upon which a reasonable juror could decide in Ms. Sierra's favor on the question of causation—*i.e.*, whether her sex was the reason that Ms. Lloyd subjected her to a hostile work environment.

Accordingly, the Court concludes that Plaintiff has not met her burden to show specific facts establishing that she was subjected to discriminatory conduct because of her status as a woman. Without this showing, there is no genuine dispute as to a material fact that could affect the substantive outcome of the litigation on this claim. *See Scott*, 550 U.S. at 380. The Court will thus grant Defendant's motion for summary judgment regarding Plaintiff's sex-based hostile work environment claim.

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED** and Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. So at the end of the day, Plaintiff's only claim remaining for a jury to decide at trial is whether Ms. Lloyd subjected Ms. Sierra to a hostile work environment based on Ms. Sierra's race (Hispanic) and/or national origin (Colombian). An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: August 13, 2019

RUDOLPH CONTRERAS
United States District Judge